IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 126,642

FREESTATE ELECTRIC COOPERATIVE, INC. et al.,
*Appellees*,

v.

KANSAS DEPARTMENT OF REVENUE,
DIVISION OF PROPERTY VALUATION,
*Appellant*.

SYLLABUS BY THE COURT

1.

K.S.A. 77-617 limits a court's consideration of new issues in proceedings under the Kansas Judicial Review Act. The trial de novo provision in K.S.A. 2023 Supp. 74-2426(c)(4)(B) applicable to the Board of Tax Appeals, which specifies "an evidentiary hearing at which issues of law and fact shall be determined anew," does not expand that limitation.

2.

For trial de novo proceedings under K.S.A. 2023 Supp. 74-2426(c)(4)(B), the agency record controls in resolving any dispute about what issues were raised before the Board of Tax Appeals. Unless an exception applies, a district court may only review those issues litigated at the administrative level.

3.

For trial de novo proceedings under K.S.A. 2023 Supp. 74-2426(c)(4)(B), the party asserting an issue was raised before the Board of Tax Appeals bears the burden to show judicial review is proper.

1

4.

In an appeal from district court proceedings conducted under K.S.A. 2023 Supp. 74-2426(c)(4)(B), an appellate court considers the agency record de novo when deciding whether the district court exceeded its scope of judicial review.

Appeal from Shawnee District Court; TERESA L. WATSON, judge. Oral argument held May 10, 2024. Opinion filed August 30, 2024. Reversed.

*Ted E. Smith*, chief counsel, Legal Services Bureau, Kansas Department of Revenue, argued the cause and was on the brief for appellant.

*Greg L. Musil*, of Rouse Frets White Goss Gentile Rhodes, P.C., of Leawood, argued the cause, and *Chris M. Mattix* and *James T. Schmidt*, of the same firm, were with him on the brief for appellees.

The opinion of the court was delivered by

BILES, J.:  Eight rural electric cooperatives sought judicial review after the Board of Tax Appeals administratively denied their property valuation challenges for the 2019 and 2020 tax years. They elected to go to district court for a trial de novo under K.S.A. 2023 Supp. 74-2426(c)(4)(B) (review specifies "an evidentiary hearing at which issues of law and fact shall be determined anew"). The court agreed with the cooperatives, concluding the valuation methodology used by the Department of Revenue's Property Valuation Division violated K.S.A. 79-5a04 (requiring "generally accepted appraisal procedures" when valuing public utilities). On appeal, PVD argues the district court exceeded its scope of review because the statutory compliance question was not litigated first with BOTA. See K.S.A. 77-617 (limiting judicial review of issues arising from administrative agency action). We agree with PVD and reverse the district court judgment.

A trial de novo under K.S.A. 2023 Supp. 74-2426(c)(4)(B) does not enlarge a district court's scope of judicial review beyond what is permitted by K.S.A. 77-617. This means the issue must have been raised with BOTA unless an exception applies. *In re Tax Appeal of Panhandle Eastern Pipe Line Co.*, 272 Kan. 1211, 1235, 39 P.3d 21 (2002) ("In an appeal from an administrative agency decision, one is limited to the issues raised at the administrative hearing."). And if there is disagreement about the issues raised, the agency record controls. See *Sierra Club v. Mosier*, 305 Kan. 1090, 1123-24, 391 P.3d 667 (2017) ("The entire concept of judicial review contemplates that an agency must have had an adequate opportunity to consider the merits of an issue."); *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 411-42, 204 P.3d 562 (2009) ("[A] district court may only review those issues litigated at the administrative level.").

Here, the record confirms BOTA explicitly and correctly identified the only issue before it was whether "PVD's income approach valuation methodology *violates Article 11, § 1 of the Kansas Constitution* as it results in non-uniform and unequal valuations of RECs statewide." (Emphasis added.) We hold the district court exceeded its scope of review by deciding PVD's methodology violated K.S.A. 79-5a04.

FACTUAL AND PROCEDURAL BACKGROUND

Rural electric cooperatives ("RECs") are nonprofit cooperative corporations that distribute electricity within their respective service areas to retail consumers, who are their member-owners. They procure electricity from Kansas Electric Power Cooperative, Inc. ("KEPCo"), also a nonprofit cooperative corporation. KEPCo comprises 18 Kansas RECs, including the eight bringing this litigation: The Ark Valley Electric Cooperative Association, Inc., The Butler Rural Electric Cooperative Association, Inc., Heartland Rural Electric Cooperative, Inc., Sumner-Cowley Electric Cooperative, Inc., The Victory

3

Electric Cooperative Association, Inc., The Sedgwick County Electric Cooperative Association, Inc., Twin Valley Electric Cooperative, Inc., and FreeState Electric Cooperative, Inc.

Since RECs are nonprofit entities, they do not generate profits; instead, they operate on margins (the amount of income exceeding operational expenses). KEPCo invoices each REC monthly. The REC, in turn, charges its members a rate to cover its expense for acquiring electricity and providing capital for future operations.

KEPCo's monthly invoice to each REC includes an item called the margin stabilization adjustment ("MSA"), which lies at the heart of this property tax controversy. MSA serves as a budgeting tool allowing KEPCo to increase (through an invoice surcharge) or decrease (through an invoice credit) the amount KEPCo collects monthly from each REC based on the difference between actual and estimated power costs. Since MSA began in 2011, KEPCo has issued an MSA credit on all but one monthly invoice.

When KEPCo provides an MSA credit, each REC decides if and how to pass the credit along to its members, the retail consumers. There are three options: (1) issue a credit to a member's monthly bill, (2) issue a single lump-sum credit annually, or (3) retain the credit by allocating it to each member's equity account, a/k/a "'patronage capital' or 'member capital.'" The first and second options reduce an REC's income, but the third does not. The eight RECs here elected the third option during the 2019 and 2020 tax years—triggering this fight over the effect on their property tax bills.

During the 2019 and 2020 tax years, PVD calculated fair market value using an income approach, which translates projected future operating income for each REC into a present value estimate. See K.S.A. 79-5a04 (requiring PVD determine public utility property's fair market value by "us[ing] generally accepted appraisal procedures"). Future operating income is projected from the RECs' current net operating income ("NOI")—

4

"the actual or anticipated income that remains after all operating expenses are deducted from effective gross income." In other words, the RECs' election on MSA credits impacts its NOI, which affects valuation and therefore taxes. A higher NOI results in a higher property valuation and higher taxes. This means PVD's chosen methodology treats our eight RECs electing the third option differently because only the first and second options reduce the RECs' income.

*Proceedings before BOTA*

The eight RECs individually appealed their property valuations to BOTA, complaining PVD treated the third option differently from the others. See K.S.A. 74-2438 (authorizing administrative appeals). Each filed a "Division of Property Valuation Appeal" with BOTA using a similar format as the one by Ark Valley, which identified as the "basis" for the appeal:

> "*All cooperatives should be valued on a uniform and equal basis.* Depending on the treatment of the MSA, the NOIs of two hypothetically identical cooperatives are different depending on whether they pass through the MSA in their [equity capital account/patronage capital account] or retain it. Therefore, PVD's income approach to value results in differing values for these identical co-ops. *We believe this violates the uniform and equal standard and an adjustment should be made to the NOI to reflect the retained MSA*." (Emphases added.)

BOTA conducted a two-day evidentiary hearing. In its decision favoring PVD, BOTA described the RECs' claim:

> "*The RECs assert PVD's income approach valuation methodology violates Article 11, § 1 of the Kansas Constitution as it results in non-uniform and unequal valuations of RECs statewide*. PVD responds that it has used a uniform and equal basis of valuation for all Kansas RECs and, therefore, its assigned valuations should be sustained.

. . . .

"The RECs accepted PVD's valuation methodology, except for their claim that PVD should change its treatment of the MSA credits. The RECs contend that their independent accounting decisions to retain or not retain the MSA credits, when combined with PVD's valuation methodology, *result in non-uniform and unequal valuation determinations among RECs and arbitrarily inflates the purported value of the subject RECs for property tax purposes*. The RECs request the Board *remedy this inequity* by ordering PVD to decrease the NOI of the subject RECs by subtracting the amount of MSA credits." (Emphases added.)

BOTA then analyzed in detail whether PVD's valuation methodology violated article 11, section 1 of the Kansas Constitution's mandate that "the legislature shall provide for a uniform and equal basis of valuation and rate of taxation of all property subject to taxation." BOTA noted the "RECs failed to identify any other similarly situated Kansas RECs that received different valuation treatment from PVD on essentially equivalent property" and concluded the RECs failed to satisfy their burden to demonstrate "PVD deliberately adopted a valuation system for public utilities resulting in intentional systemic unequal treatment of Kansas RECs." It eventually determined:

"Nothing in the evidence presented to the Board indicates that the subject RECs were appraised in a manner that violates the uniform and equal provisions of the Kansas Constitution. *Further, the Taxpayers presented no evidence persuading the Board that the instant RECs were not appraised at their respective fair market value.*" (Emphasis added.)

That single italicized sentence now becomes our focus in deciding what was litigated before BOTA. And we note neither party requested BOTA's reconsideration of its order to better specify the issues, despite their right to do so under K.S.A. 2023 Supp. 74-2426(b).

6

*Judicial review before the district court*

The RECs petitioned for judicial review in the district court where each was located: Butler, Ford, Kingman, Neosho, and Shawnee Counties. See K.S.A. 2023 Supp. 74-2426(c)(4)(B) ("District court review of [BOTA] orders shall . . . be conducted by the court of the county in which the property is located."). They then jointly filed a motion to merge the litigation under K.S.A. 2023 Supp. 60-242(c) (The Supreme Court may order the consolidation of civil actions from different judicial districts upon a party's request.). We granted that motion and transferred the consolidated cases to Shawnee County District Court.

The RECs' petition for judicial review elected a trial de novo in the district court, rather than review by the Court of Appeals. See K.S.A. 2023 Supp. 74-2426(c)(4). Their review petition alleged PVD's valuation methodology violated not only the state Constitution but also K.S.A. 79-5a04. It claimed:

"14. The valuations stated in BOTA's Opinion do not represent the fair market value of the property for [RECs], as is required by the Kansas Constitution *and Kansas statu*[*t*]*es, specifically K.S.A. 79-5a01, et seq*. BOTA was in error when it issued its Opinion which found in favor of [PVD]'s valuations. BOTA's decision was, among other things, based on determinations of fact not supported by substantial evidence on the record as a whole as well as improper conclusions of law. When viewed by the totality of the evidence which will be received by this Court in a trial de novo, the BOTA decision will be found to be otherwise unreasonable, arbitrary and/or capricious as to [RECs].

"15. [PVD]'s methodology for valuing rural cooperative utilities, as implemented and sanctioned by the BOTA decision, creates a non-uniform and unequal system of taxation in violation of the Kansas Constitution *and statutes*." (Emphases added.)

PVD objected to this framing of the dispute. It argued the RECs were asking the district court to decide something not raised with BOTA—a statutory claim under K.S.A.

7

79-5a04 that PVD failed to determine a fair market value of the RECs' property. The district court overruled PVD's objection, relying on that single sentence in BOTA's order, which it said demonstrated BOTA considered the statutory issue and decided against granting relief. It held the RECs "will not be limited to the constitutional question raised based on Article 11, Section 1 of the Kansas Constitution."

The district court then said it would address the RECs' contentions "according to the grounds for relief they cite in K.S.A. 77-621(c)." Specifically, the RECs had asked to invalidate PVD's methodology under subsections (c)(1) (agency action is unconstitutional), (c)(4) (agency action is error of law), (c)(7) (agency action is based on error of fact), and (c)(8) (agency action is unreasonable). They did not explain how those subsections might apply in a trial de novo under K.S.A. 2023 Supp. 74-2426(c)(4)(B), in which "issues of law and fact shall be determined anew."

On the merits, the district court agreed with BOTA's denial of the RECs' constitutional claim but still reversed PVD's valuations, reasoning its "flawed and incomplete" valuation method "overstates NOI for RECs." It concluded the RECs showed "by a preponderance of the evidence" that the PVD methodology resulted in unit valuations that were unsupported by evidence and were otherwise unreasonable. It ordered PVD to give "appropriate consideration" to adjusting its methodology as proposed by the RECs "regarding treatment of MSAs in the determination of utility operating income and adjust the 2019 and 2020 unit valuations accordingly."

PVD appealed, arguing the district court erred by improperly (1) expanding its scope of judicial review, (2) shifting the burden of proof to PVD, and (3) invalidating PVD's valuation methodology. The RECs did not cross-appeal the district court's constitutional holding against them, so that much is settled. See K.S.A. 2023 Supp. 60-2103(h) (appellate procedure for cross-appeal); *Cooke v. Gillespie*, 285 Kan. 748, Syl.

¶ 2, 176 P.3d 144 (2008) ("Before an appellee may present adverse rulings to the appellate court it must file a cross-appeal. If the appellee does not, the rulings are not properly before the appellate court and may not be considered.").

PVD then moved to transfer the case from the Court of Appeals, which we granted. See K.S.A. 2023 Supp. 20-3017; Supreme Court Rule 8.02 (2024 Kan. S. Ct. R. at 54). Our jurisdiction is proper. See *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981, 453 P.3d 304 (2019) (The Supreme Court "exercises concurrent jurisdiction with the Court of Appeals over all appeals over which the Court of Appeals has jurisdiction . . . . See K.S.A. 60-2101[b] ['The supreme court shall have jurisdiction to correct, modify, vacate or reverse *any* act, order or judgment of a district court . . . .' (Emphasis added.)]").

THE DISTRICT COURT EXCEEDED ITS SCOPE OF JUDICIAL REVIEW

The Kansas Judicial Review Act, K.S.A. 77-601 et seq., provides the exclusive means to obtain judicial review of state agency action, including BOTA. See K.S.A. 77-603(a) (KJRA "applies to all agencies and all proceedings for judicial review and civil enforcement of agency actions not specifically exempted by statute."); K.S.A. 77-606 ("[T]his act establishes the exclusive means of judicial review of agency action."); K.S.A. 2023 Supp. 74-2426(c) (application to BOTA); *In re Equalization Appeal of Walmart Stores, Inc.*, 316 Kan. 32, 46, 513 P.3d 457 (2022) (KJRA controls BOTA decision review). But in authorizing judicial review of agency actions, the KJRA has traditionally confined the court's ability to consider new issues not asserted first with the agency. See K.S.A. 77-617 (limiting judicial review of issues "not raised before the agency").

This constraint is premised on a petitioner's obligation to exhaust administrative remedies before going to court. See K.S.A. 77-612 (permitting petitioning for judicial review "only after exhausting all administrative remedies"); *Jarvis v. Department of Revenue*, 312 Kan. 156, 164, 473 P.3d 869 (2020) ("Courts conducting judicial review of

9

an agency action cannot usually consider issues not raised before the agency, including constitutional issues."); *Sierra Club v. Mosier*, 305 Kan. 1090, 1122, 391 P.3d 667 (2017) (stating K.S.A. 77-617 bars new issues for judicial review); *Rebel v. Kansas Department of Revenue*, 288 Kan. 419, 427, 204 P.3d 551 (2009) ("[I]f a person does not exhaust all available and adequate administrative remedies . . . , the district court lacks subject matter jurisdiction to consider the contents of the petition."). That said, K.S.A. 77-617 enumerates limited situations in which a "person may obtain judicial review" of new issues. Here, the RECs acknowledge none apply, so we direct our attention to K.S.A. 2023 Supp. 74-2426(c)(4)(B).

Since 2014, state law has included a trial de novo in the district court from BOTA orders at a taxpayer's election. See L. 2014, ch. 141, § 1. That process was amended in 2016, which applies here. L. 2016, ch. 112, § 3. The relevant statute, K.S.A. 2023 Supp. 74-2426(c)(4)(B), provides "the trial de novo shall include an evidentiary hearing *at which issues of law and fact shall be determined anew*." (Emphasis added.) We have considered an appeal from BOTA under this de novo procedure only once before, but it did not involve controversy about the district court's enlarging its scope of review. See *Bicknell v. Kansas Department of Revenue*, 315 Kan. 451, 509 P.3d 1211 (2022).

Together with the procedural mechanism allowing a trial de novo, it is important to appreciate BOTA's role and responsibility in a taxpayer's valuation appeal when, as here, the property is state assessed. K.S.A. 2023 Supp. 74-2438(a) provides generally that "[a]n appeal may be taken to [BOTA] from any finding, ruling, order, decision, final determination or other final action, including action relating to abatement or reduction of penalty and interest, on any case of the secretary of revenue or the secretary's designee by any person aggrieved thereby." Subsection (b) sets out what happens: "[BOTA] shall conduct . . . a de novo hearing unless the parties agree to submit the case on the record made before the secretary of revenue or the secretary's designee." K.S.A. 2023 Supp. 74-2438(b).

10

We explained the agency functions in the public utility context in *Northern Natural Gas Co. v. Dwyer*, 208 Kan. 337, 365, 492 P.2d 147 (1971):

"The Director [of Property Valuation] exercises independent judgment in approving the valuation of property by personnel in his department, *and the Board* [*of Tax Appeals*] *exercises its judgment anew and independent of the Director in approving the valuation and assessment of property. . . .* [BOTA] functions independently of the Director in matters of administrative judgment and decision." (Emphasis added.)

The similarity between what BOTA does in this context and what a district court must do when a taxpayer elects for a trial de novo seems obvious—the court steps into the role BOTA occupies under K.S.A. 2023 Supp. 74-2438, essentially repeating that process before a trial judge. See *In re Tax Appeal of Colorado Interstate Gas*, 270 Kan. 303, 318-19, 14 P.3d 1099 (2000) (*CIG I*) ("It is the duty of BOTA, in reviewing a valuation by the PVD, to exercise its judgment anew based on the evidence presented to it at the hearing and without giving deference to the PVD's valuation."); *Bicknell*, 315 Kan. at 484-505 (outlining district court's application of trial evidence to the same domicile factors set out in K.A.R. 92-12-4a used by BOTA in its administrative proceeding).

In effect, K.S.A. 2023 Supp. 74-2426(c)(4)(B) stands apart from customary KJRA proceedings first adopted in 1984. See L. 1984, ch. 338, § 1. And this suggests the statutorily stated grounds for relief in K.S.A. 77-621(c) on the merits do not align with the district court's trial de novo role under K.S.A. 2023 Supp. 74-2426(c)(4)(B). But that puzzle does not need to be solved today because our decision here rests entirely on the scope of judicial review.

11

*Standard of review*

To determine whether the district court exceeded its scope of review requires us to consider two questions. First, whether K.S.A. 2023 Supp. 74-2426(c)(4)(B) allows a district court to decide an issue not presented to BOTA. Second, if we conclude the statute does not allow new issues, we must decide whether the disputed issue here was in fact raised with BOTA. Specifically, we examine whether the RECs litigated whether PVD violated K.S.A. 79-5a04 before BOTA.

The first question is straightforward statutory interpretation, so our review is unlimited. See *In re Walmart Stores, Inc.*, 316 Kan. at 46. The second can be resolved only by examining the administrative hearing record to see what issues were before BOTA, which we can do as well as the district court, so again our review is unlimited. See *State v. Daniel*, 307 Kan. 428, 429-30, 410 P.3d 877 (2018) (exercising plenary review over whether an issue is properly presented below). To the extent either question requires addressing whether the district court had subject matter jurisdiction over the statutory claim, our review is unlimited as well. See *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 395, 204 P.3d 562 (2009).

The party advocating for the district court to consider an issue bears the burden to show it was raised before BOTA. See K.S.A. 2023 Supp. 74-2426(c) (any action of BOTA is subject to judicial review under KJRA); K.S.A. 77-621(a)(1) (KJRA; imposing the burden of proving agency action's invalidity on the party asserting it); *In re Tax Appeal of Colorado Interstate Gas Co.*, 276 Kan. 672, 680, 79 P.3d 770 (2003) (*CIG II*).

*First question:  interpreting K.S.A. 2023 Supp. 74-2426(c)(4)(B)*

A court acting under the KJRA lacks jurisdiction over a new issue and cannot review it, unless an exception exists. K.S.A. 77-617 (listing exceptions); see also

*Kingsley*, 288 Kan. at 410 (failure to raise an issue at the administrative hearing bars district court from reviewing that particular issue). K.S.A. 2023 Supp. 74-2426(c)(4)(B), however, presents a unique procedural approach for review, so we must consider whether it allows a district court to add new issues beyond what was raised with BOTA. We hold it does not.

Our analysis starts with the statutory language. See *City of Shawnee v. Adem*, 314 Kan. 12, 15, 494 P.3d 134 (2021) ("When interpreting a statute, we begin with its plain language, giving common words their ordinary meaning."). K.S.A. 2023 Supp. 74-2426(c) provides the KJRA governs review of any action by BOTA. And the Court of Appeals performs this review, unless a taxpayer asks for a district court trial de novo. Compare K.S.A. 2023 Supp. 74-2426(c)(4) ("Appeal of an order of [BOTA] shall be to the court of appeals as provided in subsection [c][4][A], unless a taxpayer who is a party to the order requests review in district court pursuant to subsection [c][4][B]."), with K.S.A. 77-609 (providing the district court generally reviews agency action under the KJRA). Here, the RECs chose the district court path, so our focus remains fixed on its text:

> "At the election of a taxpayer, any summary decision or full and complete opinion of the board of tax appeals issued after June 30, 2014, *may be appealed* by filing a petition for review in the district court. *Any appeal* to the district court shall be a trial de novo. . . . [T]he trial de novo shall include an evidentiary hearing *at which issues of law and fact shall be determined anew*. . . ." (Emphases added.) K.S.A. 2023 Supp. 74-2426(c)(4)(B).

The district court must follow the KJRA to assess BOTA's determination of a taxpayer's challenge in a trial de novo, since nothing in subsection (c)(4)(B) states otherwise. See K.S.A. 2023 Supp. 74-2426(c) (BOTA's action is subject to review in accordance with KJRA unless its subsections provide differently). This means the district court reviews issues decided by BOTA or issues raised but not decided by BOTA. In

either case, K.S.A. 2023 Supp. 74-2426(c)(4)(B) requires a party to first raise an issue with BOTA, so it can either act or fail to act. Otherwise, nothing exists for a district court to review. See K.S.A. 77-602(b) ("'Agency action' is '[t]he whole or a part of . . . an order," "the failure to issue . . . an order," or "an agency's performance of, or failure to perform, any other duty, function or activity, discretionary or otherwise."); K.S.A. 77-602(e) (defining an order as "an agency action of particular applicability that determines the legal rights, duties, privileges, immunities or other legal interests of one or more specific persons"); K.S.A. 2023 Supp. 74-2438(a) (providing the process for a party to appeal a PVD determination to BOTA); K.S.A. 2023 Supp. 74-2437(b), (c) (providing BOTA with the power to hear appeals); K.A.R. 94-5-1(c) ("The regulations, policies, procedures, and directives of [BOTA] shall be construed to secure expeditious determinations of all issues presented to [BOTA].").

This view is supported by the core notion that an "appeal" seeks a higher authority to *re*consider the issue. See Black's Law Dictionary 121 (11th ed. 2019) (defining appeal as a "proceeding undertaken to have a decision reconsidered by a higher authority; esp., the submission of a lower court's or agency's decision to a higher court for review and possible reversal"). And it is reinforced by K.S.A. 2023 Supp. 74-2426(c)(4)(B)'s reference to the district court's role as determining issues of law and fact "anew," which has a common understanding of "once more." See Black's Law Dictionary 109 (11th ed. 2019) (defining anew as "[o]ver again; once more; afresh").

We hold the trial de novo provision does not authorize a district court to expand its scope of judicial review barring an exception specified by law. See K.S.A. 77-612 (requiring exhaustion of administrative remedies prior to petitioning for judicial review); K.S.A. 77-617 (limitations on new issues). This means BOTA must have had an adequate opportunity to address the RECs' claim under K.S.A. 79-5a04 first since the RECs invoke no exception.

*Second question:  reviewing BOTA's record*

The RECs described their statutory claim to the district court as:  "[T]he valuations stated in BOTA's Opinion do not represent the fair market value of the property for [RECs], as is required by [K.S.A. 79-5a04]." And the court justified considering this issue based on that single sentence mentioned earlier from BOTA's order that the RECs "presented no evidence persuading the Board that [they] were not appraised at their respective fair market value." It concluded, "BOTA believed the respective valuations of the Petitioner RECs were at issue, and further, that BOTA decided against granting relief based on error in PVD's valuation of each utility."

But there is more said in BOTA's decision that the district court did not account for. To begin with, the court failed to mention, let alone reconcile, BOTA's clearly expressed issue statement:

> "*The RECs assert PVD's income approach valuation methodology violates Article 11, § 1 of the Kansas Constitution as it results in non-uniform and unequal valuations of RECs statewide*. PVD responds that it has used a uniform and equal basis of valuation for all Kansas RECs and, therefore, its assigned valuations should be sustained." (Emphasis added.)

The obvious question is why would BOTA so precisely describe the RECs' allegation only as constitutional, if statutory compliance with K.S.A. 79-5a04 was also in play? After all, K.S.A. 79-5a04 is a complicated matter. See *Mobil Pipeline Co. v. Rohmiller*, 214 Kan. 905, 921, 522 P.2d 923 (1974) ("In determining the validity of an assessment of state assessed public utility property for ad valorem tax purposes, the essential question is whether the standards prescribed by K.S.A. 79-5a04, in determining the fair market value of the public utility's property, have been determined and

15

considered by taxing officials, or intentionally and grossly disregarded."). This conspicuous clash with the district court's stated justification for taking up the statutory methodology argument is too glaring to be ignored.

Similarly, the district court overlooks that the whole BOTA decision describes and applies article 11, section 1, while supposedly taking just a single sentence to dismiss a statutory issue involving PVD's complex methodology for arriving at fair market value. See *In re Walmart Stores, Inc.*, 316 Kan. 32, Syl. ¶ 2 ("A property's fair market value determination is generally a question of fact with the fact-finder free to decide whether one appraisal or methodology is more credible than another."). This dearth of factfinding from BOTA would be odd, at best, since fair market value disputes typically generate substantial factual and legal battles. See, e.g., *In re Tax Appeal of ANR Pipeline Co.*, 276 Kan. 702, 711-31, 79 P.3d 702 (2003) (public utility); *CIG II*, 276 Kan. at 674-82 (public utility); *CIG I*, 270 Kan. at 305-15 (public utility); *Mobil Pipeline*, 214 Kan. at 908-27 (public utility); cf. *In re Tax Appeal of River Rock Energy Co.*, 313 Kan. 936, 492 P.3d 1157 (2021) (gas well working interests and equipment). Yet the district court disregards this lack of factual findings about K.S.A. 79-5a04's requirements.

The district court also avoids the RECs' own description of their administrative appeal to BOTA that did not mention K.S.A. 79-5a04 or even generally claim a statutory compliance problem. Instead, they stated the "basis" of their agency appeal in terms of a violation of "the uniform and equal standard," which is decidedly a constitutional framing. Again, such statements cry out for reconciliation before embarking on the district court's desired analytical path.

Even worse, the district court gives no indication it considered the entire agency record before extending its judicial authority over the statutory claim. And Kansas caselaw shows how probative and persuasive references to that record are when disputes

16

arise about what issues were raised with the agency. See, e.g., *Sierra Club*, 305 Kan. at 1122-24 (noting "vague references without any supporting authority" to the administrative record before concluding an issue was unpreserved).

Fortunately, our appellate record includes the transcript of BOTA's two-day evidentiary hearing, so we can perform that review ourselves. And it shows the witnesses discussed a single question—Did PVD's treatment of MSA credits violate the state Constitution under article 11, section 1? To explain, we begin with the RECs' counsel's opening statement to BOTA:

> "*So the issue in this case is how do you treat that MSA? . . .*
>
> "What PVD does is include all of that MSA in the net operating income. So it creates a larger net operating income than when you capitalize a higher value. What the Taxpayers will present to you is both evidence on valuation through our expert and through his testimony and that of our other witnesses indications that by doing that *we create a non-uniform/non-equal situation.* Because if Rural Electric Cooperative A keeps its MSA in the Coop, then its net operating income according to PVD is going to be higher and its value is going to be higher.
>
> "If that same REC credited that MSA amount out to its own retail members, the farmers and ranchers and industry, then its net operating income according to PVD will be less and its retail or its property value would be less.
>
> "So under the PVD model how you account for and distribute or retain that MSA amount has a dramatic impact on your real property value. *Now we don't think that's accurate and we think it violates the requirement of uniform and equal taxation.* And ultimately real property values should not be based upon an operating budget decision of an RECs Board of Directors, it should be based on real property valuation. *And so our expert will explain a way that not only gets to a fair real estate value* but one that is uniform and equal among all RECs regardless of how they account for a particular MSA in a particular year and a particular month*." (Emphases added.)

17

The italicized statements delineate the asserted constitutional theory, while the underlined remark vaguely mentions what counsel called "a fair real estate value." But this does not signal that the RECs separately litigated an attack on PVD's valuation methodology for noncompliance with K.S.A. 79-5a04. In fact, the BOTA transcript shows fair market value comes up only twice in witness questioning (and "fair real estate value" was never mentioned again).

One occurred during direct examination of the RECs' expert, Matt Barberich, in this exchange:

"Q      Mr. Barberich, in your opinion is there a difference among these three options in terms of who ultimately receives the benefit of margin or dividend or a refund?

"A      Who ultimately receives it, no. As we heard testimony this morning the timing of that receipt could be affected potentially by an extended period of time but ultimately who receives the benefit of the—of those funds is the same regardless of the Coop.

"Q      So from a valuation perspective does that—what does that mean from a valuation perspective?

"A      *From a valuation perspective under fair market value it should have no effect. It should have equal effect amongst similar situated properties.*" (Emphasis added.)

Barberich seemingly suggested that no matter which MSA option an REC chose, it ultimately benefits the same recipient, i.e., the member-customer. He continued to explain that these options should be treated equivalently because they equally affect similarly situated properties. But that is all he said. He did not give an opinion about whether PVD's methodology still achieved fair market value regardless of this difference

18

or state that PVD's valuation methodology was contrary to generally accepted appraisal procedures or violated K.S.A. 79-5a04. And what he said was consistent with the constitutional "uniform and equal" standard at play throughout the proceedings.

Likewise, Barberich's written report to the district court, which we were told at oral argument is the same as that provided to BOTA, misses these same points. It identified the issue as "how disparate operating and accounting treatments for Margin Stabilization Adjustments ('MSA') *result in non-uniform and unequal determinations* of Director's Unit Values for the [eight RECs]." (Emphasis added.) And it concludes: "[I]n our opinion, *there are non-uniform and unequal determinations* of Director's Unit Values between Kansas RECs as a result of how each respective Kansas REC elects to refund the available MSA to its members." (Emphasis added.) The report makes no reference to K.S.A. 79-5a04, PVD's statutory compliance with that statute, or any factual basis to dispute the assessed values under that statute.

Contrast that with Barberich's district court testimony, which the RECs tout now in their brief as related to "generally accepted appraisal procedures, which PVD is mandated by statute to use" and demonstrating "capital contributions should not be included in operating income when utilizing the income approach to value." They reference this exchange about the MSA:

> "[REC counsel]:  How about under K.S.A. 79-5a04 when it uses the phrase 'generally accepted appraisal procedures.' Would generally accepted appraisal procedures address those issues that you're describing?

> "[Barberich]:  Yes. Because they would be considered normalization adjustments in the various valuation approaches.

19

"[REC counsel]: And under generally accepted appraisal procedures, is it appropriate to try to strip out capital contributions if you're doing an income approach?

"[Barberich]: Yes."

To be sure, one can dispute whether this would be enough to substantively condemn PVD's income approach as statutorily invalid if that question were contested. But the point remains there is nothing in the agency record remotely comparable to this district court testimony. And without even that much discussion at the agency level, one cannot reasonably conclude BOTA had an adequate opportunity to consider the statutory claim's merits. See *Sierra Club,* 305 Kan. at 1123-24.

The second "fair market value" reference occurred during the cross-examination of PVD's expert, Dustin Barnes, in this exchange:

"Q      Does the cost approach arrive at a just and reasonable value for public utility property?

"A      In some cases it can. In these cases our cost approach is quite a bit higher than the income approach.

"Q      So then as you testified, the primary method PVD used to value these Rural Electric Cooperatives for 2019 and 2020 involved the income approach?

"A      Correct.

"Q      Let's see. *Does this approach enable PVD to accurately determine the fair market value of these Coops real and personal tangible and intangible property*?

"A      *I believe so.*

20

"Q      Okay. What is the starting point of analysis under the income approach?"

(Emphases added.)

Barnes presented his opinion to BOTA that the income approach accurately determines fair market value. And the parties largely agreed throughout these proceedings that the income approach was a generally accepted appraisal procedure under K.S.A. 79-5a04, so the question remains, how does this show the RECs litigated their statutory claim with BOTA? We fail to see that it does. See *Kingsley*, 288 Kan. at 411. Such a challenge requires much more than what is documented here. See *In re Walmart Stores, Inc.*, 316 Kan. 32, Syl. ¶ 2 ("A property's fair market value determination is generally a question of fact with the fact-finder free to decide whether one appraisal or methodology is more credible than another.").

Undaunted, the RECs' appellate brief refers us to other statements by counsel in the BOTA hearing as further proof that the fair-market-value issue was litigated there. But even if we were to consider counsel's statements for this purpose, the signals are faint—if they exist at all. For example, the RECs' counsel described the parties' dispute in closing as: "PVD applies the same methodology to every Kansas Rural Electric Cooperative. They took the same formula that they've used for years and applied it. *But that formula results in a non-uniform and an unequal result*." (Emphasis added.) Again, this is the language of the Kansas Constitution's article 11, section 1, not fair market value or generally accepted appraisal procedures required under K.S.A. 79-5a04.

Elsewhere, counsel mentioned "statutory requirements" to BOTA, but without any substantial connection to generally accepted appraisal practices, fair market value, or even K.S.A. 79-5a04. Counsel seemingly refers only to the RECs' independent decision to elect the third option. The referenced passage states:

21

"We're not saying there are any hypothetically equal RECs in Kansas. But the same REC will be forced by PVD's methodology to make a different judgment for its members than it would otherwise if the current formula stays in place.

"And even though I think it might be better . . . as a Board member for my REC to retain this, if I do the property tax impact is going to be a difference in valuation of millions of dollars. So I am now being forced; manipulated; compelled by PVD to change what I want to do as a Board member for my REC.

"That's what we are concerned about. *That's what we think doesn't reach the statutory requirements* and that's what we'll show you more of in our briefing." (Emphasis added.)

Regardless of what may have been intended, passing comments by counsel cannot adequately raise an issue with the agency without substantial evidence or legal argument backed with authority to link back to the issue. See *Villa v. Kansas Health Policy Authority*, 296 Kan. 315, 335, 291 P.3d 1056 (2013) (noting that without any substance behind an allegation, a reviewing court deems the argument abandoned). Otherwise, a party could undermine the tax appeal process by merely mentioning something to BOTA and then wait for a de novo proceeding with a district court to unleash the substance behind it. Such slipshod practice would effectively strip away the judicial review character of K.S.A. 2023 Supp. 74-2426(c)(4)(B) and KJRA's requirement that a party exhaust all administrative remedies.

Finally, in their appellate brief appendix, the RECs list snippets scattered throughout the BOTA transcript, claiming these demonstrate a substantive attack on PVD's statutory compliance. But none even remotely grapple with the essence of K.S.A. 79-5a04, either individually or collectively.

22

One is by Don Hellwig, who testified for the RECs. He simply explained "flowing" MSA credits through a monthly bill does not "impact the actual value of physical property." The remaining ones are from Barberich: (1) explaining he calculated the eight RECs' values in the 2019 and 2020 tax years with an income approach using a capitalization method and showing his figures; (2) confirming his valuations "match" the financial information in Taxpayers Exhibits A and B; (3) summarizing the appraisal issues in his report, discussing how different treatments of the MSA "result[] in non-uniform and unequal determinations of a value," and agreeing with the income approach to value the RECs' property; (4) noting the RECs' NOI results in a higher "real property" valuation although it should not affect "fair market value"—which we already discussed above; (5) using two hypothetical cooperatives to show PVD's model results in unequal treatment; (6) describing how the final valuation is determined from applying PVD's cap rate to the adjusted NOI; (7) confirming he valued each REC for 2019 and 2020; and (8) clarifying PVD's model may differently value the same properties.

In these excerpts, both witnesses discuss how PVD's treatment of the RECs' business judgment allegedly failed to reflect the actual property value by inflating their NOI. But a public utility's "property" includes "both real and personal, tangible and intangible" under K.S.A. 79-5a04, so it is hard to decipher what is meant by these passing comments. Besides, "actual value" and "fair market value" are not equivalent. See K.S.A. 79-5a04 (defining "fair market value" as "the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market").

Based on the record, BOTA's isolated statement that the district court found so decisive—"the Taxpayers presented no evidence persuading the Board that the instant RECs were not appraised at their respective fair market value"—merely says neither party contested the income approach's validity. Accordingly, we conclude the RECs advanced a single constitutional claim of "uniform and equal" treatment before BOTA.

23

See Kan. Const. art. 11, § 1; *State ex rel. Stephan v. Martin*, 227 Kan. 456, 468, 608 P.2d 880 (1980) (holding article 11, section 1 "prohibits favoritism, and requires uniformity in valuing property for assessment purposes so that the burden of taxation will be equal"). BOTA was correct when it identified the only issue before it was whether "PVD's income approach valuation methodology violates Article 11, § 1 of the Kansas Constitution as it results in non-uniform and unequal valuations of RECs statewide."

We hold the district court exceeded its scope of judicial review under the KJRA by deciding PVD's methodology violated K.S.A. 79-5a04.

Judgment of the district court is reversed.